# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

PATRICIA L. REED,

        Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner
of Social Security,

        Defendant.

No. C07-0067

**ORDER ON JUDICIAL REVIEW**

---

## TABLE OF CONTENTS

*I.*    *INTRODUCTION* ................................................ 2

*II.*   *PRIOR PROCEEDINGS* ...................................... 2

*III.*  *PRINCIPLES OF REVIEW* ................................... 3

*IV.*  *FACTS* ............................................................. 4
    *A.*   *Reed's Education and Employment Background* ... 4
    *B.*   *Administrative Hearing Testimony* ................. 4
        *1.*   *Reed's Testimony* ................................. 5
        *2.*   *Lee Reed's Testimony* .......................... 8
        *3.*   *Vocational Expert's Testimony* ............... 8
    *C.*   *Reed's Medical History* .............................. 9

*V.*   *CONCLUSIONS OF LAW* ..................................... 19
    *A.*   *ALJ's Disability Determination* ................... 19
    *B.*   *Whether the ALJ Fully and Fairly Developed the Record* ....... 21
        *1.*   *Dr. Palma's Opinions* .......................... 22
        *2.*   *Credibility Determination* ...................... 25
        *3.*   *Consideration of Obesity* ....................... 28
    *C.*   *Reversal or Remand* ................................. 28

*VI.*  *CONCLUSION* ................................................ 29

*VII.* *ORDER* ......................................................... 30

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Patricia L. Reed on July 20, 2007, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Reed asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Reed requests the Court to remand this matter for further proceedings.

# II. PRIOR PROCEEDINGS

Reed applied for disability insurance benefits on January 28, 2003.[1] In her application, Reed alleged an inability to work since May 31, 2001 due to fibromyalgia, sleep apnea, chronic back pain, asthma, and hiatal hernia. Reed's application was denied on April 16, 2003. On July 24, 2003, her application for disability insurance benefits was denied on reconsideration. On August 12, 2003, Reed requested an administrative hearing before an Administrative Law Judge ("ALJ"). On June 6, 2005, Reed appeared with counsel, via video conference, before ALJ George Gaffaney for an evidentiary hearing. Reed, her husband, Lee Reed, and vocational expert G. Brian Paprocki testified at the hearing. In a decision dated July 21, 2005, the ALJ denied Reed's claim. The ALJ determined that Reed was not disabled and was not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as an investigator and as an administrative assistant as both are ordinarily performed in the national economy. Reed appealed the ALJ's decision. On May 24, 2007, the Appeals

---

[1] Reed first applied for disability insurance benefits on August 20, 1999. The application was denied on December 14, 1999. On March 14, 2000, the application was denied on reconsideration. On July 28, 2000, Administrative Law Judge J. Michael Johnson vacated the reconsideration determination, dated March 14, 2000, and remanded Reed's application to Disability Determination Services for further review of her disability claim. On November 28, 2000, the remanded application was denied on reconsideration. Reed did not appeal her first application any further.

Council denied Reed's request for review. Consequently, the ALJ's July 21, 2005 decision was adopted as the Commissioner's final decision.

On July 20, 2007, Reed filed this action for judicial review. The Commissioner filed an answer on October 19, 2007. On December 4, 2007, Reed filed a brief arguing there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she can perform her past relevant work as an investigator or an administrative assistant. On February 4, 2008, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On August 27, 2007, both parties consented to proceed before the undersigned in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court must consider "whether the ALJ's decision is supported by substantial evidence on the record as a whole." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004)). Furthermore, "[s]ubstantial evidence is 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (quoting *Cruse v. Bowen*, 867 F.2d 1183,

1184 (8th Cir. 1989), in turn quoting *Consolo v. Fed. Mar. Comm'n*, 282 U.S. 607, 620 (1966)).

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester*, 416 F.3d at 889 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Guilliams*, 393 F.3d at 801. "[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Id*. (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)).

## IV. FACTS

### A. Reed's Education and Employment Background

Reed was born in 1949. She has a high school education. The record contains a detailed earnings report for Reed. The earnings report provides that Reed had consistent earnings from 1971 to 1994. In 1995, her earnings were greatly diminished. She earned approximately $22,000 less in 1995 than in 1994. Between 1996 and 1998 she earned a total of about $2,400. She had no earnings in 1999. Reed earned approximately $8,000 in 2000, and approximately $7,000 in 2001. She earned less than $1,000, however, in 2002. In 2003, she earned approximately $2,000. Finally, in 2004, she earned approximately $5,000. According to the earnings report, Reed's 2003 and 2004 earnings were from self-employment. The record contains no information for earnings after 2004.[2] At the administrative hearing, Reed testified that in 2003 and 2004, she had a contract job as an administrative assistant and worked four hours per day.

### B. Administrative Hearing Testimony

---

[2] At the administrative hearing, held on June 6, 2005, Reed testified that she earned $100 per week for watching a two-year old girl for four hours per day, four days per week.

4

## 1. *Reed's Testimony*

At the hearing, Reed's attorney questioned Reed regarding her medical history. Reed's attorney first asked her to describe her problems with her lower back. Reed answered that it was difficult to sit for any length of time over one-half hour and to walk any distance due to pain in her lower back and legs. Reed also testified that she took Arthrotec and Tylenol as pain medication for her back.

Reed's attorney next asked her to describe her difficulties with fibromyalgia. According to Reed, the fibromyalgia causes her to have chronic fatigue. Specifically, Reed testified that with fibromyalgia "[y]ou just don't feel like moving or doing anything sometimes. You have -- actually, you have 18 trigger points in your body, and when he did the examination, and I went back for the results, he said not only do you have the fibromyalgia, but you have 16 trigger points that are inflamed. And, you know, out of 18."[3] Reed indicated that she treats her fibromyalgia with various forms of physical therapy.

Reed's attorney also asked her to describe her diagnosis of sleep apnea. She testified that she underwent a sleep study and the results were "bad." She uses a CPAP for treatment. When asked whether she uses her CPAP regularly, she replied:

> A:      Yes. Yes. Not as -- well, I will say this, I use it during the day more than I do at night, because I had to be adjusted a couple of times with my CPAP. And one doctor said I might even have to have the surgery for sleep apnea, because when I wake up, I feel like I'm smothering when I sleep with that on.
>
> Q:      Do you sleep with it on at night?
>
> A:      Yeah. I'll fall asleep with it on, but when I wake up, if I wake up in the night -- and usually I do -- I just -- I have to take it off.
>
> Q:      Do you get claustrophobic?

---

[3] *See* Administrative Record at 618.

> A: Something happens where it just feels like I'm drowning. But during the day I use it, you know, after a nap -- or before a nap.
>
> Q: And you go to sleep with it during your naps?
>
> A: Sometimes, yes. Uh-huh. Yes.
>
> Q: And when you have this sleep, do you still -- do you feel refreshed when you wake up from a nap?
>
> A: I'll feel better. I feel -- yeah, I have to take naps.

(Administrative Record at 622) Reed also testified that she takes two or three naps each day which last forty-five minutes to ninety minutes per nap. She further testified that she does not have continuous sleep throughout the night, and sleeps only three to four hours at a time.

When asked whether she had problems with her knees, Reed answered that she didn't have any cartilage in her right knee. Surgery was suggested for her knee, but she testified that she was "holding off" on the surgery. Her attorney also asked whether her knee problems affected her ability to walk or stand. Reed replied:

> A: The sitting or standing, it's just like when we finish here now, when I get ready to stand up, all, you know, I have to kind of regroup, or another example is I'm serving on the board, and I have to kind of take a leave of absence because of the sitting. We listen to cases, people present cases. So I took a leave of absence for over a year now, because of the sitting.
>
> Q: Sitting requirements.
>
> A: Sitting requirements, yes.
>
> Q: Why are you waiting on the knee surgery?
>
> A: Well, I just have -- he just said -- he suggested doing it. And he said, that I did -- I was going for injections, and then stopped that. But he suggested that I would probably need to have surgery sometime.

(Administrative Record at 626)

Lastly, Reed and her attorney discussed her activities of daily living. According to Reed, she no longer does housework. She does not clean, dust, vacuum, or mop her house. She also does very little cooking. Reed further testified:

6

A: I don't feel like doing a lot of things that I used to do, you know. One of the things that I have known is I have to actually plan my day. I can only do -- lift -- I don't even do grocery shopping. I'll go to the grocery store if I have to go, but my husband does all that now, because I just can't take the moving around and looking and all of that.

Q: How does that affect you?

A: It makes me tired.

Q: It wears you out.

A: Just going to the grocery store to do the -- I don't do the shopping anymore. If I go to the store, its just to pick up one or two items, not very much.

(Administrative Record at 628)

The ALJ also questioned Reed. The ALJ asked her why she thought she was unable to work a full-time job. Reed answered that she could not work full-time because of chronic back pain and sleep apnea. Specifically, Reed testified that she got "very, very" tired after three or four hours and often needed to take a nap. When asked if she had difficulty concentrating or remembering things, Reed replied that she had problems with her memory and focusing on things, including remembering her doctors and reading articles in the newspaper. The ALJ and Reed had the following colloquy regarding household activities:

Q: . . . You'd indicated that your husband did the vacuuming. But if I read it right, you made the beds and changed the sheets. Is that still the case?

A: Sometimes. He does that too. He helps with that.

Q: And do you do dishes?

A: Not like I used to. He helps with -- he helps with everything.

Q: All right. And how about the laundry? You indicated some difficulty navigating the steps up and down. Are you still able to do some laundry?

A: The steps are really bad for me. He takes the hamper down. I can't take the hamper down. I have to have help with it, the wash.

7

(Administrative Record at 633)

### 2. Lee Reed's Testimony

Lee Reed ("Lee") is Reed's husband. They have been married for thirty-two years. At the hearing, Lee testified that Reed's medical problems have "really affected our household, not only, you know, through our physical needs, but also financially. She puts a lot of stress upon me, because she can't do the things that she used to do, as she already stated."[4] According to Lee, Reed's most significant difficulties are with pain and fatigue. Lee explained that the pain and fatigue make it difficult for Reed to do anything without having to take a nap or lay down. Specifically, Lee testified that Reed had "difficulty just getting up, standing, any amount of time moving around, even riding in the vehicle for any period of time, it affects her. So she's just, you know, she gets really tired at just about anything. She just can't do it."[5]

### 3. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert G. Brian Paprocki with a hypothetical for an individual with the following limitations:

> [The individual] would [be] limit[ed to] lifting [up] to ten pounds with five pounds frequently, stand two hours in an eight-hour workday, sit for six hours in an eight-hour workday, with an ability to change positions every 60 minutes. The non-exertional limits are all occasional only. Handling, frequent only bilaterally, frequent only exposure to humidity and cold, occasional only exposure to atmospheric changes.

(Administrative Record at 635) The vocational expert testified that under such limitations, Reed could return to her past work as an investigator or as an administrative assistant. The ALJ provided the vocational expert with a second hypothetical for an individual with the following limitations:

---

[4] *See* Administrative Record at 631.

[5] *Id.*

> Hypothetical number two would have, again, the lifting limited
> to ten pounds, with five pounds frequent, standing 30 minutes
> at a time for two hours in an eight-hour workday, sitting 30
> minutes at a time for six hours in an eight-hour workday.
> Non-exertional stays the same. Environmental, exposure to
> cold, humidity, and atmospheric changes all are occasional
> only.

(Administrative Record at 636) The vocational expert testified that Reed could also return to her past work as an investigator or administrative assistant under the second hypothetical. The ALJ provided the vocational expert with a third hypothetical which was identical to the second hypothetical, except that the individual would need two unscheduled rest breaks of one hour each day. The vocational expert testified that under such limitations, Reed would generally be precluded from competitive employment.

### C. Reed's Medical History

On January 29, 1998, Reed was evaluated by Dr. Thomas D. Mulakkan, M.D., for complaints of pain in the left elbow and parethesia in the left hand. Specifically, Dr. Mulakkan noted that:

> [Reed] has been having pain in the left anterior chest as well
> as in the left shoulder and this radiates to the left upper arm,
> elbow and forearm, hands and fingers for the past several
> weeks. This is associated with some numbness and tingling in
> the fingers. She also feels some weakness in the left upper
> limb and the symptoms have been worse for the past
> week. . . . The pain in the left shoulder and left upper limb is
> worse with movements of the shoulder as well as with lifting
> or with activity using the left shoulder. . . . She has some
> tingling and numbness in the fingers, mainly in the left upper
> limb, both palmar and dorsal with tingling in the left elbow.

(Administrative Record at 206) Upon examination, Dr. Mulakkan found Reed to be mildly obese. Dr. Mulakkan noted some tenderness in the left elbow and the Tinel sign was positive at the left wrist. Dr. Mulakkan further noted that movements in the left upper limb were slightly painful. Dr. Mulakkan found no "evidence for significant

radiculopathy, neuropathy or myopathy."[6]   Dr. Mulakkan determined that Reed's symptoms of chest and back pain were most likely associated with some fibromyofascitis. Dr. Mulakkan advised Reed to wear a wrist splint and an elbow pad for a couple of months as treatment.

On February 13, 1998, Reed was examined by Dr. Robert H. Choi, M.D., Ph.D., for complaints of pain to the upper chest, arm, and hand. Dr. Choi found that Reed had tenderness in the upper anterior chest on the left and in the extensor area at the left elbow. When her left elbow was palpated, Dr. Choi noted that Reed "appeared to indicate this was reproducing most of her symptoms of shooting pain going up and down her arm."[7] Dr. Choi diagnosed Reed with mild carpel tunnel syndrome, extensor tendinitis at the elbow, and a focal area of muscular tenderness in the anterior chest. Dr. Choi performed a trigger point injection to the extensor tendon on the left as treatment.

On May 22, 1998, Reed saw Dr. Hosung Chung, M.D., with complaints of left arm pain. After examining her, Dr. Chung found that Reed had a "clinical presentation of C7 radiculopathy on the left side, on the basis of location of pain, and manifested weakness of triceps, wrist and finger extensors, finger abductors and hand grip and triceps areflexia."[8]   Dr. Chung determined that he needed to know more information before suggesting a treatment plan, and recommended a cervical myelogram and post-myelographic CT scan.

On October 22, 1998, Reed was evaluated by Dr. A.W. Alexander, M.D. She complained of pain in the posterior neck, left shoulder, and lower back. Dr. Alexander performed an electrodiagnostic study, including a nerve conduction study and an electromyography. Dr. Alexander found electrodiagnostic evidence suggestive of mild

---

[6] *See* Administrative Record at 207.

[7] *See* Administrative Record at 221.

[8] *Id.* at 226.

bilateral carpel tunnel syndrome and generalized peripheral neuropathy involving the bilateral upper extremities, and left cervical myelopathy. Dr. Alexander did not provide a treatment assessment.

On November 9, 1998, Reed received a second opinion from Dr. C.A. Abernathey regarding her neck and back problems. Dr. Abernathey reviewed Reed's pain history:

> [Reed] presents with a chronic history of neck pain with intermittent LUE [(Left Upper Extremity)] paresthesia. She has undergone conservative management under the care of Dr. Lederman, Dr. Alexander, and Dr. Chung. To date, medical management has not alleviated her symptomatology. In the course of her work-up, she has undergone both MRI studies and CT myelography which demonstrate diffuse degenerative changes consistent with age with moderate cervical stenosis at multiple levels. The cervical spinal cord does demonstrate diminution throughout it's expanse. However, the myelogram tends to suggest that there is adequate subarachnoid space around the spinal cord. Additionally, she does not describe any significant upper motor neuron signs. Dr. Chung reportedly offered her surgical decompression and fusion at C6-7, according to the patient.

(Administrative Record at 228) After reviewing Reed's medical records, Dr. Abernathey concluded that the MRI and CT myelogram did not "clearly identify a specific source for her symptoms."[9] Dr. Abernathey noted that Reed might benefit from C6-7 surgery. Dr. Abernathey further noted, however, that C6-7 surgery might also be of no benefit to her at all. Dr. Abernathey suggested further "conservative management . . . due to . . . [the] paucity of clinical findings."[10]

On December 15, 1998, Reed returned to Dr. Alexander for further evaluation of her back pain. Dr. Alexander noted that Reed's pain "radiates from her lower back down

---

[9] *See* Administrative Record at 228.

[10] *Id.*

the bilateral extremities, especially when going from sitting to standing position. She denies having numbness or tingling or weakness in her lower extremities."[11] Dr. Alexander performed a second electrodiagnostic study and found electrodiagnostic evidence suggestive of left L5-S1 radiculopathy. Dr. Alexander requested an MRI of Reed's lumbosacral spine and suggested physical therapy as treatment. On January 21, 1999, Dr. Alexander provided Reed with the results of her MRI. Dr. Alexander explained that she had mild circumferential disc bulges at L4-5 and L5-S1, but no focal disc protrusion or herniations. Dr. Alexander recommended that Reed continue physical therapy as treatment. Reed saw Dr. Alexander again, on March 19, 1999, with continued lower back pain. Dr. Alexander diagnosed her with lower back myofascial pain syndrome and left L5-S1 radiculopathy. Dr. Alexander suggested continued physical therapy and trigger point injections as treatment. On March 23, 1999, Dr. Alexander administered trigger point injections at fourteen "very tender" trigger points on Reed. On April 5, 1999, Reed had a second round of trigger point injections. She informed Dr. Alexander that her pain decreased fifty percent after her first trigger point injections. Reed continued to have lower back pain and received further trigger point injections on May 6, 1999, and May 26, 1999. On June 7, 1999, Reed met with Dr. Alexander and informed him that she was doing "quite well." Dr. Alexander had Reed continue physical therapy as treatment.

On June 21, 1999, Reed had another follow-up visit with Dr. Alexander. She informed Dr. Alexander that she was "doing better" and performing her exercises. However, she complained that when sat for a prolonged period, she had severe lower back pain. Dr. Alexander suggested that she consider having a lumbar epidural steroid injection in conjunction with her trigger point injections as treatment. Dr. Alexander also prescribed Arthrotec for pain relief. On July 6, 1999, Reed saw Dr. Alexander complaining of severe lower back pain. Reed informed Dr. Alexander that the pain in her lower back was a 10 out of 10 when she sat longer than 30 minutes. Dr. Alexander

---

[11] *Id.* at 324.

scheduled a lumbar epidural steroid injection for Reed as treatment. Reed had trigger point injections on July 26, 2006, and August 9, 1999.

On September 21, 1999, Reed met with Dr. Robert N. Federhofer, D.O., for a consultation regarding her lower back pain. According to Dr. Federhofer, Reed described her back pain as a dull and aching pain made worse with sitting. Dr. Federhofer noted that her pain does not appear to be aggravated by standing or walking. Dr. Federhofer further noted that she was able to do all of her activities of daily living and household chores. Dr. Federhofer assessed Reed's pain as "closely follow[ing] that of degenerative disc and/or facet."[12]  Dr. Federhofer recommended that Reed receive a series of facet injections and transforaminal epidural injections at the 4-5 or 5-S1 level for treatment. Reed received these injections on October 19, 1999. Reed had a follow-up appointment with Dr. Federhofer on November 8, 1999, and it was decided at that appointment that further facet injections and transforaminal epidural injections at the 4-5 or 5-S1 were unnecessary because they would only offer her transient relief. Dr. Federhofer recommended that Reed seek treatment from a pain clinic to manage her pain.

On October 30, 1999, Dr. Federhofer sent Jill Hunt of the Division of Vocational Rehab Services a letter containing an assessment of Reed's work related capacity. Dr. Federhofer's letter provided:

> I think that [Reed] is limited partly by obesity from any type of physical activity that requires repetitive stooping, climbing, kneeling, or crawling. She should have no difficulty, though, with the use of upper extremities or with fine motor movement in the hands, nor is there any impairment of the hearing or speech.
>
> Because of the arthritic nature of her pain, cold, wet environments would be uncomfortable for her and also she would probably have to change position at least every hour between standing and sitting, if not more frequently, due to the

---

[12] *See* Administrative Record at 347.

> degenerative changes of the lower lumbar spine represented by
> degenerative disc.

> It is noted also that she is able to perform activities of daily
> living and household chores. . . .

(Administrative Record at 341)

On December 13, 1999, Dr. Rodney Carlson, M.D., reviewed Reed's medical records for Disability Determination Services ("DDS") and provided DDS with a residual functional capacity (RFC) assessment. Dr. Carlson determined that Reed could: (1) Occasionally lift and/or carry 20 pounds, (2) frequently carry and/or lift 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, and (4) sit with normal breaks for a total of about six hours in an eight-hour workday. Dr. Carlson also determined that Reed could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Carlson found no manipulative, visual, communicative, or environmental limitations, except that Reed should avoid exposure to fumes, odors, dusts, gases, and poor ventilation. Dr. Carlson concluded:

> Evidence in the file is consistent with the allegations and no
> inconsistencies across sources of information are noted.
> [Reed's] credibility is partially eroded by her reports of her
> activities being significantly limited on one hand yet by her
> own statements she is able to maintain her home and do most
> of the housekeeping, drive a vehicle, dancing, and exercising
> regularly to help improve her symptomatology. Her
> allegations are credible to the extent that she could be limited
> as outlined on the attached RFC.

(Administrative Record at 358)

On April 25, 2000, Reed met with Dr. Richard P. Bose, Jr., M.D., complaining of "excruciating low back pain." After examining Reed, Dr. Bose diagnosed her with lumbar/lumbosacral radicular pain and probable arachnoiditis, risk for secondary myofascial pain components, the possibility of facet joint-referred pain, the possibility of direct discogenic pain with pain referred directly from degenerative discs, history of

generalized anxiety disorder, probably endogenous anxiety, possible history of panic attacks, and ASA status II. Dr. Bose suggested lumbar epidural steroid injections as treatment. Dr. Bose performed lumbar epidural steroid injections on May 15, 2000, June 26, 2000, and August 24, 2000.

On August 24, 2001, Reed was examined by Dr. Claro T. Palma, M.D., for fibromyalgia. After examining her, Dr. Palma diagnosed Reed with myalgia, degenerative disc disorder of the cervical lumbar spine, and sleep apnea. Dr. Palma determined that further testing was needed before suggesting a course of treatment. At a follow-up visit, on October 25, 2001, Dr. Palma diagnosed Reed with diffuse myalgia, secondary to fibromyalgia and overlapping sleep apnea, osteoarthritis of the peripheral joints, and degenerative spine arthritis of the cervical and lumbar spine. Dr. Palma recommended that Reed continue her previous treatments from other doctors for an additional two to four weeks, and then, he would reassess her symptoms at that time.

On September 27, 2001, Reed underwent a sleep study at Covenant Medical Center Sleep Lab in Waterloo, Iowa. Dr. Daren Tobert, M.D., reported the results of the sleep study. Dr. Tobert diagnosed Reed with obstructive sleep apnea, but found that it was well treated using a CPAP. On October 18, 2001, Reed met with Dr. Tobert for follow-up regarding he obstructive sleep apnea. Except for the fit of her mask, Reed reported that she felt "markedly" better in terms of her daytime wakefulness. Dr. Tobert concluded that Reed was feeling "quite a bit better."

On January 17, 2002, Dr. Palma saw Reed for a follow-up appointment. Dr. Palma diagnosed her with diffuse myalgia, secondary to fibromyalgia, history of sleep apnea syndrome, morbid obesity, osteoarthritis of the peripheral joints, and degenerative spine arthritis of the cervical and lumbar spine. Dr. Palma prescribed Trazodone and Arthrotec as treatment. Dr. Palma also encouraged Reed to lose weight and exercise.

On February 20, 2002, Reed had a follow-up appointment with Dr. Tobert regarding her sleep apnea. Dr. Tobert reported that Reed was wearing the CPAP regularly

and showed "marked" improvement in her symptoms. Dr. Tobert noted that Reed complained of throat dryness when using the CPAP. Dr. Tobert added a humidifier to the CPAP in order to alleviate the throat dryness. Dr. Tobert saw Reed again on August 27, 2002, and noted that she was doing "very well" with the CPAP unit. On October 3, 2002, Dr. Tobert saw Reed on follow-up, and noted that Reed was not using the CPAP unit regularly because it bothered her throat. Dr. Tobert prescribed a heated humidifier to help alleviate her throat problems when using the CPAP.

On November 4, 2002, Dr. Palma met with Reed for a follow-up appointment. Dr. Palma diagnosed Reed with fibromyalgia with persistent symptoms, osteoarthritis of the peripheral joints symptomatic at the right knee, degenerative spine arthritis of the cervical and lumbar spine with persistent symptoms, and history of sleep apnea and morbid obesity. Dr. Palma continued to treat her with Trazodone and Arthrotec and encouraged her to lose weight and exercise.

On November 11, 2002, Reed met with Dr. Harbhajan Singh, M.D., regarding her sleep apnea. Dr. Singh noted that "[i]nitially Reed had been doing very well, but recently, [she] had developed dryness of mouth with CPAP. Humidifier was added to the CPAP, but [she] still continued to have some dryness of the throat and difficulty tolerating CPAP. [She] is not using CPAP regularly."[13] Dr. Singh recommended that Reed have her CPAP unit checked by Home Medical and scheduled an appointment for follow-up. At her follow-up appointment, on December 10, 2002, Reed informed Dr. Singh that she continued to have difficulty tolerating her CPAP unit. Dr. Singh opined that Reed's significant weight gain might be the cause of her difficulties with the CPAP. Dr. Singh also scheduled a CPAP retitration study for Reed. Following the retitration study, Dr. Singh adjusted Reed's CPAP levels and encouraged her to lose weight as treatment. Dr. Singh also noted that if the new CPAP levels did not help, she should start using a BiPAP unit.

---

[13] *See* Administrative Record at 475.

On January 15, 2003, Reed met with Dr. Henry W. Snead, M.D. Reed was referred to Dr. Snead to help her with weight loss. After examining her, Dr. Snead diagnosed Reed with exogenous obesity. Dr. Snead also noted problems with binge eating, inactivity, low metabolic states, sleep apnea, exacerbation of fibromyalgia, exacerbation of osteoarthritis of the knees, and arterial hypertension. Dr. Snead treated her by placing her on a "very low" calorie diet, encouraging 30 minutes of aerobic exercise five days per week, and prescribing vitamins for her.

On February 6, 2003, Reed had a follow-up appointment with Dr. Palma for her fibromyalgia. Dr. Palma diagnosed her with fibromyalgia with variable persistent symptoms, symptoms suggestive of carpal tunnel syndrome in both wrists, osteoarthritis of the peripheral joints symptomatic at the right knee, degenerative spine arthritis of the cervical and lumbar spine, and sleep apnea, secondary to morbid obesity. Dr. Palma continued Reed's Arthrotec and Trazodone prescriptions, suggested she use wrist splints at night to help her carpal tunnel symptoms, and encouraged her to lose weight as treatment.

Reed also saw Dr. Singh on February 6, 2003. Reed informed Dr. Singh that she continued to have difficulty tolerating the CPAP unit. Dr. Singh switched her from using the CPAP to using a BiPAP. Dr. Singh also advised Reed to lose weight. On April 10, 2003, Reed had a follow-up appointment. Dr. Singh noted that Reed "currently requires . . . BI-PAP because she didn't tolerate CPAP. [She] still has a problem but is able to use BI-PAP about two to four hours at night time. [She] has no difficulty falling asleep with the BI-PAP on. Dr. Singh recommended that she continue to use the BiPAP unit and lose weight as treatment.

On April 15, 2003, Dr. Rene Staudacher, D.O., reviewed Reed's medical records for DDS and provided DDS with a RFC assessment. Dr. Staudacher determined that Reed could: (1) Occasionally lift and/or carry 20 pounds, (2) frequently carry and/or lift 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an

eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday. Dr. Staudacher also determined that Reed was unlimited in her ability to push and/or pull in accordance with her lifting/carrying limitations. Dr. Staudacher further found that Reed could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Staudacher also found that Reed was limited in her ability to handle, but was unlimited in her ability to reach in all directions, finger, and feel. Lastly, Dr. Staudacher found that Reed had no visual, communicative, or environmental limitations. Dr. Staudacher concluded that "[w]hile there are some inconsistencies noted, she does have documented MDIs that would decrease her functional abilities as outlined under the exertional limitations."[14]

On May 23, 2003, Dr. Palma filled out a fibromyalgia RFC questionnaire provided by Reed's attorney. Dr. Palma diagnosed Reed with fibromyalgia, osteoarthritis, carpal tunnel syndrome, morbid obesity, degenerative disc disease, and obstructive sleep apnea. Dr. Palma identified her prognosis as "chronic persistent." Dr. Palma identified Reed's symptoms as follows: Multiple tender points, nonrestorative sleep, chronic fatigue, and carpal tunnel syndrome. Dr. Palma opined that during a typical workday, Reed would occasionally experience pain or other symptoms severe enough to interfere with her attention and concentration to perform simple tasks.[15] Dr. Palma further opined that Reed was capable of low stress jobs. Dr. Palma noted that Reed could sit at one time for thirty minutes, and could stand at one time for thirty minutes. Dr. Palma determined that Reed could stand/walk for about two hours in an eight-hour workday and could sit about two hours in an eight-hour workday. Dr. Palma noted that Reed would need a job that allowed periods of walking around every thirty minutes in an eight-hour workday, and permitted shifting positions at will from sitting, standing, or walking, and allowed her to take

---

[14] *See* Administrative Record at 427.

[15] According to the questionnaire, "occasionally" means 6% - 33% of an eight-hour workday.

unscheduled breaks during an eight-hour workday. Dr. Palma limited Reed to lifting less than 10 pounds frequently, 10 pounds occasionally, and rarely lifting 20 pounds or 50 pounds. Dr. Palma further limited Reed to rarely twisting, stooping, crouching, and climbing ladders and stairs. Dr. Palma indicated that Reed could occasionally look down, turn her head to the left or right, look up, and hold her head in a static position. Lastly, Dr. Palma provided that Reed would have significant limitations in doing repetitive reaching, handling, and fingering.

On June 9, 2003, Reed met with Dr. Palma for a follow-up appointment. Dr. Palma diagnosed her with fibromyalgia with variable persistent symptoms, mild carpal tunnel syndrome, stable with splinting, osteoarthritis of the peripheral joints with variable right knee pain, degenerative spine arthritis of the cervical and lumbar spine, and sleep apnea, secondary to morbid obesity. Dr. Palma encouraged Reed to exercise and lose weight, continued to prescribe her Trazodone and Arthrotec, and referred her to physical therapy for treatment.

On July 18, 2003, Dr. Claude H. Koons, M.D., reviewed Reed's medical records for DDS and provided DDS with a third RFC assessment. Dr. Koons determined that Reed could: (1) Occasionally lift and/or carry 10 pounds, (2) frequently carry and/or lift less than 10 pounds, (3) stand and/or walk with normal breaks for a total of at least two hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday. Dr. Koons also determined that Reed was unlimited in her ability to push and/or pull. Dr. Koons further found that Reed could occasionally climb, balance, stoop, kneel, crouch, and crawl. Lastly, Dr. Koons found that Reed had no manipulative, visual, communicative, or environmental limitations.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Reed is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security

regulations. *See* 20 C.F.R. § 404.1520(a)-(f); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)); *see also* 20 C.F.R. § 404.1520(a)-(f). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Eichelberger*, 390 F.3d at 590-91 (citing *Ramirez v. Barnhart*, 292 F.3d 576, 580 (8th Cir. 2002)).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir. 1995) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'" *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).

The ALJ applied the first step of the analysis and determined that Reed had not engaged in substantial gainful activity since her alleged disability onset date, May 31, 2001. At the second step, the ALJ concluded, from the medical evidence, that Reed had the following severe impairments: Degenerative disc disease of the cervical and lumbar spine, fibromyalgia, right knee pain, obesity, sleep apnea, asthma, carpal tunnel syndrome, hypertension, colitis, gastritis, reflux esophagitis, and depression. At the third step, the ALJ found that Reed did not have "an impairment or combination of impairments listed in, or medically equal to one listed in [20 C.F.R. § 404,] Appendix 1, Subpart P, Regulations No. 4 [(the Listing of Impairments)]." At the fourth step, the ALJ determined Reed's RFC as follows:

> [Reed] has retained the residual functional capacity to lift 10 pounds occasionally and five pounds frequently; stand 30 minutes at a time for 2 hours out of an 8 hour work day; sit 30 minutes at a time for 6 hours out of an 8 hour work day; occasionally climb stairs, climb ladders, balance, stoop, kneel, crouch, and crawl; frequently handle bilaterally; occasionally work in areas of atmospheric changes; and occasionally work in areas of cold and humidity.

Using this RFC, the ALJ determined that Reed was functionally capable of performing her past relevant work as an investigator or as an administrative assistant as she performed those jobs in the past and as they are ordinarily performed in the national economy. Thus, the ALJ concluded Reed was "not disabled."

## B. Whether the ALJ Fully and Fairly Developed the Record

Reed contends that the ALJ erred in three respects. Reed argues that the ALJ erred by failing to explain his reasons for including some, but not all of Dr. Palma's opinions in Reed's RFC. Reed also argues that the ALJ provided inadequate analysis under *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) in determining the credibility of her subjective allegations of pain, functional limitation, and disability. Lastly, Reed argues that the ALJ failed to consider the effects of her obesity when assessing her RFC. Reed requests that the Court reverse the Commissioner's decision and remand it with directions to award

benefits. Alternatively, Reed requests this matter be remanded for further proceedings. The Commissioner argues that there is substantial evidence in the record as a whole which supports the ALJ's decision; and therefore, the decision should be affirmed.

### 1. *Dr. Palma's Opinions*

Reed argues that the ALJ failed to properly consider Dr. Palma's medical opinions in determining her RFC. Reed notes that the ALJ summarized Dr. Palma's opinions, but "failed to include some of Dr. Palma's limitations in his assessment of . . . [her RFC], such as the need to walk one or two minutes every thirty minutes; and change positions at will. In addition, the ALJ failed to mention at all Dr. Palma's opinion that [Reed] could sit only two hours in an eight hour day[.] . . ."[16] Reed also points out that, when asked at the administrative hearing, the vocational expert testified that if all of Dr. Palma's limitations were included in her RFC, then she could not perform any type of full-time competitive employment.[17] Thus, Reed maintains that the ALJ erred by failing to explain his reasons for including some, but not all of Dr. Palma's limitations in her RFC.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The regulations provide that the longer the treating relationship between a physician and a patient, the more

---

[16] *See* Reed's Brief at 13.

[17] *See* Administrative Record at 637-38.

weight should be given to that treating physician's medical opinions. *See* 20 C.F.R. § 404.1527(d)(2)(I). Furthermore, an ALJ is "encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Singh*, 222 F.3d at 452. The regulations require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.* "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson*, 361 F.3d at 1070 (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

Additionally, an ALJ has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*

*v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)).  However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). Moreover, the ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998).  Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)).

The record demonstrates that the ALJ considered Dr. Palma's opinions and summarized them as follows:

> Dr. Palma opined [Reed] could occasionally lift 10 pounds; rarely twist, stoop, bend, crouch, climb ladders, and climb stairs; occasionally look down, turn head left or right, look up, and hold head in a static position; sit 30 minutes; stand 30 minutes; sit, stand, and walk about 2 hours in an 8 hour work day; walk one to two minutes every thirty minutes in an 8 hour workday; change positions at will; sometimes require unscheduled breaks; experience significant limitation with respect to repetitive reaching, handling, or fingering; and symptoms would occasionally interfere with attention and concentration. . . .
>
> On July 18, 2003, a medical consultant employed by [DDS] stated [Dr. Palma's] assessment regarding lifting, sitting, and standing was given considerable weight and reduced [Reed's RFC] to a sedentary level of exertion.

(Administrative Record at 20)  There is no further discussion of Dr. Palma's opinions in the ALJ's decision, including any discussion or determination on the weight Dr. Palma's opinions should receive.  Furthermore, even though the ALJ noted that a *medical consultant* gave Dr. Palma's opinions considerable weight when determining Reed's RFC for DDS, the ALJ did not discuss *his* reasons for including some of Dr. Palma's opinions

in his determination of Reed's RFC, while excluding other limitations from his determination. An ALJ has a duty to develop the record fully and fairly. *Cox*, 495 F.3d at 618. An ALJ must also assess a claimant's RFC on all of the relevant evidence. *Guilliams*, 393 F.3d at 803. Relevant evidence includes the opinions of treating physicians. *Lacroix*, 465 F.3d at 887. If an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has failed to meet these requirements. In addition to failing to weigh Dr. Palma's opinions, the ALJ, in his decision, failed to provide any reasons, let alone "good reasons" for either including or excluding Dr. Palma's opinions regarding Reed's RFC in his own RFC determination. Therefore, the Court finds that this matter should be remanded so that the ALJ may fully and fairly develop the record with regard to Dr. Palma's opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Palma's opinions and support his reasons with evidence from the record, particularly with regard to Reed's RFC.

## 2. Credibility Determination

Reed argues that the ALJ improperly discredited her testimony regarding her subjective allegations of pain, functional limitations, and total disability. Specifically, Reed argues that the ALJ's analysis under *Polaski* was deficient because the ALJ ignored substantial evidence in the record which was favorable to her testimony. The Commissioner argues that the ALJ properly considered Reed's subjective complaints.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322. However, the absence of objective medical evidence to support a claimant's subjective complaints is a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). "The [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating

and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski*, 739 F.2d at 1322. Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (citing *Polaski*, 739 F.2d at 1322). However, the ALJ must give reasons for discrediting the claimant. *Id.* (citing *Strongson*, 361 F.3d at 1072). Furthermore, "[w]hen rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) (citation omitted). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall*, 274 F.3d at 1218).

In his decision, the ALJ properly set forth the law for making a credibility determination under *Polaski* and the Social Security Regulations. In applying the law, the ALJ determined:

> As mentioned earlier, the record reflected work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate [Reed's] daily activities, at least at times, [have] been somewhat greater than [she] has generally reported. Although [Reed] received treatment for her allegedly disabling impairments, the treatment was essentially routine and conservative in nature. There is evidence that [Reed] was not

entirely compliant in taking prescribed medications and
following recommended treatment, which suggests her
symptoms may not have been as limiting as [she] alleged in
connection with this application. [Reed] has not taken any
narcotic based pain relieving medications in spite of allegations
of quite limiting pain. She did not experience side effects
from medication. [Reed's] description of the severity of her
pain was extreme at times, almost to the point of seeming
implausible. For instance, [Reed] described 'excruciating low
back pain;' however, as mentioned previously, she did not take
strong pain relieving medications. . . . Therefore, the
undersigned finds [Reed] has been less than credible regarding
her allegation that she is totally disabled.

(Administrative Record at 22) The ALJ's credibility determination appears to be generally
compliant with the requirements of *Polaski* and the Social Security Regulations; however,
the Court finds that the ALJ's decision lacks the required detail for discrediting a claimant
and explaining the inconsistencies between the claimant's subjective allegations and the
record as a whole. *See Baker*, 159 F.3d at 1144. For example, although the ALJ points
out that Reed had work activity after her alleged disability onset date, the record reflects
that her part-time work was short-lived because she was unable to sit for four hours at one
time. Reed's inability to sit for fours at a given time is consistent with the medical opinion
of Dr. Palma. The ALJ also points out that Reed's treatment for back pain was
"conservative" and did not include any narcotic medication. The record demonstrates,
however, that Reed had numerous point injections, steroid epidural injections, and took
Athrotec and Trazodone to manage her pain. Lastly, the ALJ maintains that Reed was not
"entirely compliant" in following her recommended treatment. The ALJ offers no details
regarding this finding, and the Court is unable to determine when or how Reed was
noncompliant with her recommended treatment. Accordingly, the Court determines that
this matter should be remanded for further consideration of Reed's subjective allegations
of pain. On remand, the ALJ shall set forth in detail his reasons for finding Reed's
subjective allegations to be credible or not credible. If on remand, the ALJ finds Reed's

testimony not to be credible, the ALJ shall fully explain the reasons for his credibility determination and fully explain the inconsistencies between Reed's subjective allegations of pain and the evidence in the record.

### 3. Consideration of Obesity

Reed argues that the ALJ failed to properly consider her obesity. Specifically, Reed argues "[t]he ALJ failed to fully appreciate [her] obesity, particularly the fact that her weight increased eighty pounds shortly after she became disabled. [Reed's] obesity affected her sleep apnea. [Reed's] sleep apnea affected her fibromyalgia. [Reed's] obesity certainly affected her back."[18]

Social Security Ruling ("SSR") 02-1p provides that the Social Security Administration considers "obesity to be a medically determinable impairment and reminds adjudicators to consider the effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p also instructs "adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity."

In his decision, the ALJ determined that Reed's obesity was a severe impairment. The ALJ failed, however, to take Reed's obesity into account in assessing her RFC. On remand, and in accordance with SSR 02-1p, the ALJ shall consider the effects of both Reed's obesity and the combined effects of Reed's obesity with her other impairments when assessing her RFC.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

---

[18] *See* Reed's Brief at 18.

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ failed to fully and fairly develop the record with regard to Dr. Palma's medical opinions, the credibility of Reed's subjective allegations of pain, functional limitations, and disability, and the effect Reed's obesity has on assessing her RFC. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ should develop the record fully and fairly with regard to the opinions Dr. Palma. Specifically, the ALJ shall provide clear reasons for accepting or rejecting Dr. Palma's opinions and support those reasons with evidence from the record, particularly with regard to Reed's RFC. The ALJ shall also set forth in detail his reasons for finding Reed's subjective allegations of pain to be credible or not credible. Lastly, the ALJ should consider the effects of both Reed's obesity and the combined effects of Reed's obesity with her other impairments when assessing her RFC.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this _21st_ day of April, 2008.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA